511 A.2d 1138

**DAWSON'S CHARTER SERVICE, et al.**

v.

**Michael W. CHIN.**

**No. 1639, Sept. Term, 1985.**

Court of Special Appeals of Maryland.

July 16, 1986.

Glenn C. Parker (Robert L. Humphreys, Jr., Smith, Somerville & Case, on brief), Baltimore, for appellants.

Bernard Jay Williams, Silver Spring, for appellee.

Argued before ADKINS, BLOOM and KARWACKI, JJ.

ADKINS, Judge.

This is a worker's compensation case. The worker, appellee, Michael Chin, suffered an eye injury that rendered his right eye effectively useless without corrective lenses. With corrective lenses, he has 20/20 vision in that eye. The question is whether, under those circumstances, Chin's right eye was 100 percent disabled.

Chin was employed by appellant, Dawson's Charter Service.[1] While on the job one day, he was hammering a piece of metal. A metal fragment lodged in his right eye. The fragment was surgically removed, but a cataract developed.

---

1. The other appellant is West American Insurance Company, Dawson's Charter Service's worker's compensation insurance carrier. For simplicity's sake, we shall refer to both appellants as "Employer".

This was subsequently excised, along with Chin's right ocular lens. Chin later underwent YAG laser capsuloplasty and was then fitted with an aphakic contact lens and eyeglasses. With the lens and glasses, the vision in his right eye was 20/20 Snellen.

Chin sought worker compensation benefits. Before the Workmen's Compensation Commission, he testified that "I can't see a thing" with his right eye without the use of the lens and glasses. Dr. Richard North reported that Chin's "uncorrected vision represents a 100% loss of functional vision in that eye." Dr. Herman K. Goldberg opined that without correction "this patient would still be medically and legally blind in that eye since it would require the use of a contact lens to make him see since the cataract has been removed."

The Commission awarded Chin temporary total disability. This is not questioned on appeal. It also found that he had a permanent partial disability because of "100% loss of vision of the right eye." Art. 101, § 36(3)(b). It awarded serious disability benefits under § 36(4a).

Employer appealed to the Circuit Court for Montgomery County, where cross-motions for summary judgment were filed. Judge Peter Messitte denied Employer's and granted Chin's, thereby affirming the Commission. Employer now appeals to this court, asserting that Judge Messitte was wrong in both respects. We disagree, but before explaining why, we must address a jurisdictional problem.

### Jurisdictional Problem

If this court lacks jurisdiction over an appeal, we must address the issue *nostra sponte*. *Washington Suburban Sanitary Commission v. Ross*, 62 Md.App. 418, 421, 489 A.2d 1135 (1985). Such an issue arises in this case. It is produced by the sequence of events we now recount.

On October 31, 1985, Judge Messitte had a hearing on the cross-motions for summary judgment. The pertinent docket entries read thus:

10/31/85 # 17   Hearing on [Employer's] Motion for Summary Judgment ... denied....

10/31/85 # 18   Hearing on [Chin's] Cross Motion for Summary Judgment ... granted, order to be submitted.

11/8/85 # 19   [Employer's] Order for Appeal filed....

\*   \*   \*   \*   \*   \*

12/11/85 # 21   Order of Court [Messite, [*sic*] J.) that [Employer's] Motion for Summary Judgment is Denied and that [Chin's] Cross Motion for Summary Judgment is Granted filed.  Judgment entered.... CLERK'S NOTE: FIRST SEE [*SIC*] BY CLERK THIS DATE.

12/11/85 # 22   Judgment entered in favor of [Chin] and costs.

\*   \*   \*   \*   \*   \*

12/27/85 # 24   [Employer's] order for appeal filed....

12/30/85 # 26   Mandate from the Court of Special Appeals—December 27, 1985, Line of Dismissal [of the appeal noted on November 8] filed by counsel for [Employer's], Appeal Dismissed, filed.

What happened here was that the order Judge Messitte signed on October 31, 1985, somehow became misplaced in the clerk's office and was not actually docketed until December 11 (Docket Entry # 21).  When counsel for Employer learned of this, he concluded that Docket Entries # 17 and # 18 did not constitute a judgment;  therefore, his first appeal (Docket Entry # 19) was premature.  After the order of October 31 was actually docketed and judgment formally entered (Docket Entry # 22), he noted another appeal (Docket Entry # 24).  He also dismissed the first appeal, but the mandate reflecting that dismissal did not issue until December 27 and was not received by the circuit court until December 30 (Docket Entry # 26).  The problem facing us is whether what counsel thought was the actual appealable judgment—the Docket Entry of December 11— was a nullity because entered when the first appeal was

still undismissed. If so, the second appeal was from a non-judgment, and we would have no jurisdiction to hear it. *Staggs v. Blue Cross of Maryland, Inc.*, 57 Md.App. 576, 578, 471 A.2d 326 (1984). The first appeal was, of course, dismissed, so it could not be the basis for the exercise of our jurisdiction.

In December 1985, when the non-docketing of the October 31 order came to counsel's attention, it was reasonable for him to conclude that the docket entries of October 31 did not amount to an appealable final judgment. As of that date, the mere granting of a motion was not thought to be such a judgment. *See, e.g., Happy 40, Inc. v. Miller*, 57 Md.App. 589, 471 A.2d 333 (1984). We learned otherwise, however, on February 25, 1986, when the Court of Appeals decided *Houghton v. County Commissioners of Kent County*, 305 Md. 407, 504 A.2d 1145 (1986). In *Houghton* the Court construed Md.Rule 2–601 (which had become effective on July 1, 1984) and held that "an unqualified order granting a motion [that has] the effect of putting the parties out of court, is an final appealable order" despite the lack of a formal entry of judgment, once the order is docketed. 305 Md. at 412. In the case before us, the docket entries of October 31, 1985, seem to show that Chin's cross-motion for summary judgment was granted and this had the effect of putting the parties out of court; it terminated the case. If *that* is so, then Employer's initial appeal was proper and timely. But that appeal was voluntarily dismissed, and the time to appeal from that order had long passed when Employer noted its second appeal. The second appeal, from a purported final judgment that merely restated in almost *haec verba* the earlier final judgment, would not be timely. *See Ratcliffe v. Clarke's Red Barn*, 64 Md.App. 293, 301, 494 A.2d 983 (1985). We would, therefore, have no jurisdiction to hear this appeal.

■ But despite *Houghton*, we believe that the October 31 entries did not amount to an appealable judgment. The *Houghton* court speaks in terms of "an *unqualified* order

... putting the parties out of court ... [emphasis supplied]." *Id.* The critical entry (# 18) that reflected the granting of Chin's cross-motion for summary judgment was *not* unqualified. It added the words "order to be submitted." As we have observed, the provisions of Rule 2–601 were central to the *Houghton* decision. At the date of that decision (and on October 31, 1985), the pertinent language of Rule 2–601(a) was: "Upon ... a decision by the court ... denying all relief, the clerk shall forthwith enter the judgment, *unless the court orders otherwise* [emphasis supplied]." The direction that an order be submitted was, in effect, a direction to the clerk not to enter judgment until the order had been signed and filed. The docket entry, therefore, was not an "unqualified" determination under *Houghton,* nor did it authorize or amount to the entry of judgment under Rule 2–601(a). We agree, therefore, that there was no appealable final judgment on October 31.

■ This leads us to the *Staggs* problem. When, in December, judgment was entered in unequivocal terms, Dawson's first appeal was pending and undismissed. Did that fact deprive the trial court of power to enter an effective and appealable judgment on December 11? Under the circumstances of this case, we do not believe so.

In *Staggs* a motion for summary judgment in favor of Blue Cross, one of several defendants, was granted. A similar motion on behalf of other defendants was denied. Thus, only one of several claims had been adjudicated. To make the Blue Cross judgment appealable, the trial judge was required to enter final judgment on that claim and to certify that there was no just reason for delay. Former Rule 605 (present Rule 2–602). He failed to do so. Nevertheless, Staggs and others appealed. Later, they recognized the problem and ineffectively attempted to dismiss the appeal. While the appeal was still pending, the trial court attempted to make the judgment final under former Rule 605. A second appeal was noted. That, we held, was a nullity, because when the first appeal was entered, and

prior to its actual dismissal, the trial court lacked power "to cure the jurisdictional defect occasioned by appellants' failure to obey Md.Rule 605 a...." 57 Md.App. at 578, 471 A.2d 326.

The correction of the jurisdictional defect in *Staggs* required the trial court to modify the very order that was then on appeal. It had to exercise its discretion and decide whether the case was appropriate for a 605 certification. *See Canterbury Riding Condominium v. Chesapeake Investors, Inc.,* 66 Md.App. 635, 505 A.2d 858 (1986). It could not, as *Staggs* holds, modify the very order that was the subject of the appeal, because the appeal had deprived it of jurisdiction to do so. But the case before us is very different. Judge Messitte signed an order, on October 31, 1985, that constituted a final order under *Houghton.* The record suggests that the order somehow was mislaid in the clerk's office. When it was at last docketed, on December 11, it had not been modified, revised, or changed in any respect. The judge had exercised no jurisdiction or power over it. It said nothing more or less than the October 31 docket entries. Its filing, then, was a mere ministerial act by the clerk, and not an exercise of jurisdiction by the court. Under these unusual circumstances, we hold that the first and only appealable judgment was properly entered on December 11. The appeal from that judgment was timely and is before us.

### The Merits

We turn now to the merits of the case. Employer advances two reasons for reversal. The first is that there was a genuine dispute as to a material fact—the extent to which Chin retained any use of his right eye, uncorrected by contact lens and glasses. The second is that Judge Messitte erred as a matter of law in affirming the Workmen's Compensation Commission. If Employer is correct on either ground, we must reverse. Summary judgment may not be granted if there is a genuine dispute as to material

facts or if the party seeking judgment is not "entitled to judgment as a matter of law." Md.Rule 2–501(e).

■■■ With respect to Employer's first argument, it correctly observes that an appeal of a worker compensation case is a *de novo* proceeding in the circuit court. *Turner v. Public Defender*, 61 Md.App. 393, 486 A.2d 804 (1985). That, however, does not mean that summary judgment is unavailable in a worker compensation appeal. *Maloney v. Carling National Breweries, Inc.*, 52 Md.App. 556, 451 A.2d 343 (1982). If the requirements of Md.Rule 2–501 are met, summary judgment may be invoked to prevent an unnecessary trial in a worker compensation appeal, just as in any other action. One of those requirements is, of course, that there be no genuine dispute of a material fact. Rule 2–501(e). *Lowman v. Consolidated Rail Corp.*, 68 Md.App. 64, 509 A.2d 1239, No. 1403, Sept. Term, 1985, filed June 9, 1986. In Employer's own motion for summary judgment in the circuit court it asserted "that there is no dispute as to any material fact...." In its answer to Chin's cross-motion, Employer admitted "that there is no genuine dispute of a material fact and that this Court may rule upon this Motion as a matter of law." At argument before Judge Messitte, Employer argued only law:

> It is our contention that though [Chin] sustained a very serious disability, it is not 100 percent because 100 percent disability [under the applicable statute] means total disability, and total disability would mean a total loss. A total loss cannot be corrected. That is the thrust of our argument, Your Honor.

Since the "dispute of fact" issue was neither raised nor decided below, it is not before us. Md.Rule 1085.

This brings us to the issue that is before us: Whether, as a matter of law, it was error to conclude that Chin had suffered total loss of use of his right eye, despite the fact that vision in his right eye was correctible to 20/20.

■■ Code, Art. 101, § 36(3)(b) deals with permanent partial disability produced by certain specific injuries. It calls

for payments to be made for varying periods, depending on the injury involved. "For the loss of an eye" the period of payments is "two hundred and fifty weeks," which, as we have seen, triggers the serious disability provisions of subsection (4a). Section 36(3)(c) explains:

Permanent loss of use of ... [an] eye, shall be considered as the equivalent of the loss of such ... eye, and for the loss of the fractional part of the vision of either one or both eyes, the injured employee shall be compensated in like proportion to the compensation for total loss of vision, *and in arriving at the fractional part of vision loss regard shall not be had for the effect that correcting lens or lenses may have upon the eye or eyes* [emphasis supplied].

It is Employer's position that under this statute there cannot be, as a matter of law, total loss of use of an eye if the vision in the eye is correctible. The statutory language barring consideration of the effect of correcting lenses applies, it contends, only to a partial loss of use of an eye. Thus, if Chin had suffered a 99.99 percent loss of use of his eye, correctible to 20/20 vision, the correcting effect could not be considered. But if, as here, the loss of use was 100 percent, the words emphasized in the preceding quotation should be disregarded. According to Employer, this reading of the statute is required because a total loss of use of an eye is, as a matter of logic, uncorrectible. Moreover, to reach a contrary result would be absurd. Chin is now entitled to compensation at the serious disability rate for a period of 333 weeks. Should he sustain a similar injury to his left eye, similarly correctible, he would be entitled to compensation for another 333 weeks, for a total of 666 weeks—more than the 500 weeks established as the compensation period for loss of use of the entire body. Art. 101, § 36(4)(a).

In support of these arguments Employer offers two Maryland decisions and one from another jurisdiction. In *Kraushar v. Cummins Construction Corp.*, 180 Md. 486, 25 A.2d 439 (1942), the question was whether removal of the

claimant's right eye constituted total loss of use of the eye when, prior to the removal, he had had only 5 percent vision in the eye. The Court of Appeals allowed compensation for 100 percent loss of use. *Kraushar* is not helpful to Employer. The Court held that removal of an eye is loss of use of that eye, despite its previous poor condition. It did not address the correctibility problem that is at the core of this case; Kraushar's eye having been totally removed, there was no vision left to correct.

The issue in *Gillespie v. R & J Construction Company,* 275 Md. 454, 341 A.2d 417 (1975) was whether a claimant who had 90 percent loss of vision in one eye could be compensated for 100 percent loss of vision. Quite obviously, the Court's answer was "no." Characterizing Art. 101, § 36(3) as "unambiguous," 275 Md. at 454, 341 A.2d 417, Judge Smith observed that "by Gillespie's own testimony" there was no total loss of vision. *Id.* at 458, 341 A.2d 417. Since there was no total loss of vision, Gillespie could be compensated only for fractional loss of vision pursuant to § 36(3)(c). In *Gillespie,* as in *Kraushar,* there was no discussion of the effect of correctibility on Gillespie's entitlement to compensation. The case dealt only with the basic, uncorrected loss of vision: 90 percent in *Gillespie,* 100 percent in the case *sub judice.*

Employer's out-of-state authority is *Pridgeon v. Industrial Commission,* 89 Ill.2d 477, 60 Ill.Dec. 617, 433 N.E.2d 659 (1982). The facts in that case are close to the ones before us. The claimant's eye was injured in an industrial accident. A cataract developed. The lens was removed from the eye. The Commission found a 75 percent loss of vision, as opposed to a total loss. Holding that "loss of use of an eye is a question of fact," 60 Ill.Dec. at 618, 433 N.E.2d at 660, the Illinois intermediate appellate court affirmed because "the determination of the Commission was [not] against the manifest weight of the evidence." *Id.* 60 Ill.Dec. at 619, 433 N.E.2d at 662. It is clear from the opinion that Illinois had no statute similar to Maryland's § 36(3)(c). Once again, therefore, there is no discussion of

the effect of such a statute on the question of compensability.[2]

None of these cases lend support to Employer's contentions because none of them address the central issue in this case—the effect of § 36(3)(c). As we read that provision, it demolishes Employer's arguments.

The statutory language clearly commands that in the case of a fractional loss of use of an eye, correctibility is not to be weighed in the compensation calculus. We can perceive no reason why that legislative policy should not be applied to total loss of use of an eye. Why should the legislature remove correctibility from consideration if loss of use is 99.99 percent, but factor it in if loss of use is 100 percent? If Employer's view is correct, the 99.99 percent claimant, whose vision is corrected to 20/20, gets substantial compensation, whereas the 100 percent claimant, whose vision is corrected to 20/20 thanks to modern medical procedures, gets nothing. Given that the worker's compensation law is to be liberally construed to effect its general purposes, Art. 101, § 53, we cannot ascribe such an intent to the legislature. We reject Employer's arguments. Chief Judge Gilbert explained in *Gly Construction Co. v. Davis*, 60 Md. App. 602, 607, 483 A.2d 1330 (1985): "There is no requirement in § 36(3)(c) that in order for there to be a 100 percent loss of use, the hand be no more than a useless piece of flesh and bone attached to the arm only as a decoration that is aesthetically more pleasing than a prosthesis [footnote omitted]." We think this reasoning applies equally to an eye; indeed, the legislative direction to disregard correctibility in the case of eye injuries lends it even more force.

Our conclusion is strengthened by *Western Contracting Corp. v. Industrial Commission*, 15 Utah 2d 208, 390 P.2d

---

**2.** It is worthy of note that some states, even absent a statute like § 36(3)(c), have concluded that correctibility is not to be considered when determining compensability for an eye injury. *See, e.g., Johannsen v. Union Iron Works*, 97 N.J.L. 569, 117 A. 639 (1922), and *Pocahontas Fuel Co. v. Workmen's Compensation Appeal Board*, 118 W.Va. 565, 191 S.E. 49 (1937).

125 (1964). In that case an industrial accident had rendered a claimant essentially totally blind in one eye. With the use of an optical lens, however, there was substantial restoration of vision. The Supreme Court of Utah affirmed an award for 100% loss of use of the eye: "Our statute seems to be among the most favorable to allowing a complete award for total blindness of one eye even though substantial restoration of eyesight could be effected by the use of an optical lens." 390 P.2d at 127. Professor Larson is in accord:

> Another question encountered in loss-of-use cases is whether the impairment should be evaluated before or after correction by such devices or glasses [or] contact lenses.... The usual holding is that loss of use should be judged on the basis of uncorrected vision ..., and that therefore loss of use will not be ruled out because some correction is achieved. Indeed, an award for total blindness in one eye has been upheld although use of an optical lens had restored a "substantial fraction of the eye." 2 A. Larson, *The Law of Workmen's Compensation*, § 58.13(f) (1983 ed.)

The Maryland statute requires that result here.

Turning to Employer's argument that the legislature could not have intended such a result, because it might give Chin what Employer views as a windfall, we observe that the benificent intent and the social policies underlying the worker compensation law do not necessarily produce mathematically logical results in every case. We are not dealing with mere mathematics, but with the legislative response to problems of an industrial society. *See Anchor Motor Freight, Inc. v. Subsequent Injury Fund*, 278 Md. 320, 329, 363 A.2d 505 (1976) (result reached by Court made it possible that claimant could suffer a 128% disability, but "such a result is not illogical in this area of the law"). The legislature has chosen to permit an award for total loss of use, without regard to correctibility. As Judge Messitte astutely pointed out, Employer's arguments about legislative policy should be directed to the General Assembly, not to a

court. *See Baltimore County v. Penn,* 66 Md.App. 199, 214, 503 A.2d 257 (1986).

We hold, therefore, that total loss of vision in an eye is compensable as total loss of the eye, even if vision is restored by the use of a lens or glasses.

JUDGMENT AFFIRMED.

APPELLANT TO PAY THE COSTS.