519 A.2d 215

Alonzo TUBAYA

v.

TAM JOINES, INC., et al.

No. 403, Sept. Term, 1986.

Court of Special Appeals of Maryland.

Jan. 8, 1987.

John J. Dilli, Jr., Baltimore, for appellant.

William R. Van Wambeke (Glenn C. Parker, Robert L. Humphreys, Jr. and Smith, Somerville & Case on the brief), Baltimore, for appellees.

Argued before GARRITY, BLOOM and WENNER, JJ.

GARRITY, Judge.

Alonzo Tubaya injured his left eye in an industrial accident. As a result, his vision in that eye was sufficiently blurred as to allow him merely to distinguish the bulk of objects rather than their identity. He appeals from a partial summary judgment which limited any factual determination as to the extent of his loss of vision, as a matter of law, to less than 100 percent. We shall examine whether, in light of Md.Ann. Code (1985 Repl. Vol.) art. 101, § 36(3)(c), a fact finder may determine the extent of vision loss as total when sight is so destroyed that there remains no useful vision.

## Facts

Mr. Tubaya, while employed by the appellee, Tam Joines, Inc., as a tire mechanic, was struck in his left eye by a metal coat hanger while at work on January 28, 1982. The appellant was immediately taken to the Anne Arundel County General Hospital where he underwent surgery to repair his lacerated cornea. The surgery also required the removal of the eye's ocular lens and a portion of its iris.

Mr. Tubaya was subsequently treated by Dr. Marcos T. Doxanas for residual cornea scarring of the left eye, with lens and iris involvement, and for secondary glaucoma and exotropia. In July, 1982, Dr. Doxanas determined that medically his patient's visual acuity of the injured eye was 20/200 Snellen and that his potential for rehabilitation was minimal. The ophthalmologist further opined that the appellant suffered an 80 percent loss of vision together with a loss of depth perception.

In December, 1983, the appellant underwent surgery at Johns Hopkins Hospital for rhegmatogenuous retinal detachment of the left eye, but his post operative visual acuity decreased to 20/300. In April, 1984, however, Dr. Herman Goldberg examined the appellant on behalf of the insurer and concluded that the visual acuity of the eye was 20/100 with an 80 percent loss of vision.

At a hearing before the Workmen's Compensation Commission (Commission) in December, 1984, Mr. Tubaya testified that he could not identify objects, that he could only see white, and that the objects looked "like white little blurs." He stated, "I can't see. If I didn't have my good eye, I wouldn't be able to do anything. I couldn't use it...."

The Commission determined that Mr. Tubaya had sustained a permanent partial disability resulting in 80 percent loss of vision of his left eye and he appealed to the Circuit Court for Anne Arundel County. The circuit court, however, entered an order on behalf of the employer-insurer granting its motion for summary judgment to limit the claimant's recovery to less than 100 percent loss of vision in his left eye. While recommending legislative modification,[1] the hearing judge found that the "uncontroverted facts" failed to justify an award for total loss of vision, as such condition has been defined by the cases considering the subject in the context of the applicable statute.

Mr. Tubaya argues, in essence, that if the ability of his left eye to identify objects is destroyed to the extent that there remains no useful vision, it is improper to deny a jury the opportunity to consider evidence that he has suffered a total disability in such eye even though some sight may remain by medical evaluation as to anatomical impairment. The employer-insurer contends, on the other hand, that an eye which retains any vision whatsoever, including that of merely being able to see light, must be deemed, as a matter of law, to be fractionally, not totally, impaired.

Md.Ann.Code (1985 Repl. Vol.), art. 101, § 36(3)(c), provides:

---

**1.** In his Opinion and Order, the trial judge, Hon. James C. Cawood, Jr., remarked,

We see no reason why the legislature could not define total loss of use of an eye to include cases where the vision is so blurred as to permit the claimant to distinguish only the bulk of objects.

*Permanent loss of use of* hand, arm, foot, leg or *eye, shall be considered as the equivalent of the loss of such* hand, arm, foot, leg or *eye,* and for the loss of the fractional part of the vision of either one or both eyes, the injured employee shall be compensated in like proportion to the compensation for total loss of vision, and in arriving at the fractional part of vision loss regard shall not be had for the effect that correcting lens or lenses may have upon the eye or eyes. (emphasis added).

In advancing its theory that the retention of a medically evaluated fractional amount of vision prevents the trier of fact from finding total loss, as a matter of law, the employer-insurer relies on *Gillespie v. R & J Construction Co.,* 275 Md. 454, 341 A.2d 417 (1975). A carpenter by trade, Gillespie was injured when a nail punctured the cornea of his right eye. Although the jury, as well as the Workmen's Compensation Commission, determined that Gillespie had sustained a permanent partial disability resulting in 100 percent loss of vision to his eye, the circuit court granted a motion for judgment *n.o.v.* on behalf of the employer. The basis for the judgment was that the evidence failed to support compensation in excess of 90 percent disability. In addition to Gillespie's ophthalmologist's evaluation that his patient had sustained but a 90 percent permanent disability, Gillespie described in some detail the difficulties he was experiencing with his right eye:

[H]e could not do the work that he used to do, that he could not get up on a building and walk across joists now, that he could not saw a piece of wood following a straight line or use a power saw to follow a straight line using his right eye only, that he could not read a ruler, that he could not climb ladders because he could not judge distance, etc. Although at one point Gillespie testified that glasses were of no assistance to him, he did concede that they assisted him in reading. As earlier indicated, he said he could see out of the eye but it is always "blurry."

*Id.* at 456, 341 A.2d 417. In affirming the judgment *n.o.v.*, the Court noted, "There is no total loss of vision here by Gillespie's own testimony. The highest percent of loss of vision to which reference is made is 90%." *Id.* at 458, 341 A.2d 417.

Appellant Tubaya stresses that *Gillespie* was based on a factual determination and that the court's holding did not deny a fact finder from considering a disability rating greater than that of an anatomical rating. The appellant contends that, notwithstanding the evaluations by Drs. Doxanas and Goldberg that he suffered a vision loss of 80 percent, he is entitled to consideration by a jury of an award for total loss of vision. In reliance on *Gly Construction Co. v. Davis*, 60 Md.App. 602, 606, 483 A.2d 1330 (1984), *cert. denied*, 302 Md. 288, 487 A.2d 292 (1985), the appellant argues that the lower court's finding was erroneous as "compensation is not paid for an 'injury,' but for the resulting 'disability.' " *Id.* at 607, 483 A.2d 1330.

In *Gly*, the issue was whether the Workmen's Compensation Commission or the lower court on appeal was limited to awarding disability at the percentage established by the medical evidence, which was 90 percent.

*Gly* involved a situation wherein Davis's left hand was severely injured in the course of his employment and he was subjected to surgery. His index and second fingers were removed; extensive portions of flesh and bone were cut from his hand; and his left thumb almost totally lacked mobility and did not function in opposition to the remaining two fingers which had but limited movement. Davis could neither close his fist nor use his hand to any extent, and whenever he attempted to use his hand, which was unable to grip anything, he complained of pain.

Writing on our behalf in *Gly*, Chief Judge Gilbert stated:

We are unable to find within the workmen's compensation statute, Md.Ann.Code art. 101, any words that expressly or implicitly limit the Commission, or the court on appeal,

to consider only medical evaluation. *See* art. 101, § 11. The function of the Commission initially is to determine the extent of loss of use, and hence the percentage of disability, and not merely to adopt medical evaluations of anatomical impairment. *Cf.* art. 101, § 15 (Compensation is payable because of employee's *"disability* or death") (emphasis supplied).

*Id.* at 606, 483 A.2d 1330.

In affirming the circuit court's award by the Commission of 100 percent disability of the claimant's hand, we held:

To hold that in all cases the Commission or the court is compelled to find an amount of disability that is no greater than the highest medical evaluation and no less than the lowest medical evaluation would impermissibly shift the legal determination of "disability" to physicians. That result would be in clear contravention of the legislative intent and traditional role of the Commission or court.

*Id.* at 607, 483 A.2d 1330.

Following closely on the heels of *Gly,* our focus of attention in *Dawson's Charter Service v. Chin,* 68 Md.App. 433, 511 A.2d 1138 (1986), was directed towards the question of whether an "effectively useless eye" could have ever been considered 100 percent disabled when 20/20 vision was restored with corrective lens.

During the course of his employment, Chin was hammering a piece of metal. A metal fragment lodged in his right eye. The fragment was surgically removed, but a cataract developed. This was subsequently excised, along with Chin's right ocular lens. Chin later underwent lazer capsuloplasty, and with the aid of lens and glasses, his vision was restored to 20/20 Snellen. Without the use of the lens and glasses, however, Chin testified before the Commission that "I can't see a thing." Disregarding the medical evaluation that Chin's uncorrected vision represented a 100 percent

loss of functional vision in the affected eye, the employer argued that, as a matter of law, there could not be total loss of use of an eye if the vision in the eye were correctible.

Speaking on our behalf in rejecting the employer's argument, Judge Adkins observed:

> The statutory language clearly commands that in the case of a fractional loss of use of an eye, correctibility is not to be weighed in the compensation calculus. We can perceive no reason why that legislative policy should not be applied to total loss of use of an eye. Why should the legislature remove correctibility from consideration if loss of use is 99.99 percent, but factor it in if loss of use is 100 percent? ... Chief Judge Gilbert explained in *Gly Construction Co. v. Davis*, 60 Md.App. 602, 607, 483 A.2d 1330 (1984): "There is no requirement in § 36(3)(c) that in order for there to be a 100 percent loss of use, the hand be no more than a useless piece of flesh and bone attached to the arm only as a decoration that is aesthetically more pleasing than a prosthesis [footnote omitted]." *We think this reasoning applies equally to an eye;* indeed, the legislative direction to disregard correctibility in the case of eye injuries lends it even more force.
>
> *       *       *       *       *       *
>
> We hold, therefore, *that total loss of vision in an eye is compensable as total loss of use of the eye,* even if vision is restored by the use of a lens or glasses. (emphasis added).

*Id.* at 443–47, 511 A.2d 1138.

As did Mr. Chin, appellant Tubaya in the case at bar suffered a corneal laceration and a ruptured lens, which was surgically removed. In addition, a portion of his iris was also involved and removed. Mr. Tubaya's condition was further complicated by the development of glaucoma and, according to medical testimony, any attempt at visual rehabilitation, because of the marked irregularity of the

cornea induced by the scar tissue, was thought to be "not in the best interest of the patient."

In contrast to the evidence in *Gillespie* but in harmony with that in *Chin*, Mr. Tubaya testified, "I can't see. If I didn't have my good eye, I wouldn't be able to do anything. I couldn't use it...." At most, testimony before the Commission established that Mr. Tubaya had the ability to follow the motion of objects with his left eye but could not distinguish what they were as they appeared "like white little blurs."

The clear purpose and intent of art. 101, § 36(3)(c) is to provide compensation to an injured worker who has suffered the permanent loss of use of his eye's ability to function as an organ of sight. When such condition occurs as a result of an industrial accident, the statute provides that *"[p]ermanent loss of use of [an] ... eye, shall be considered as the equivalent of the loss of such ... eye. ..."* In addition, if the loss of vision is but fractional, the statute provides "the injured employee shall be compensated in like proportion to the compensation for total loss of vision...." (emphasis added).

In light of the plain language of the statute, it is evident that mere use of a medical standard equating a percentage of visual acuity to that of loss of vision is inadequate, and indeed inappropriate, from a disability standpoint where the purpose and function of the legislative measure is to compensate for loss of use rather than merely for an injury to a scheduled member.

Within the context of art. 101, § 36(3)(c), we hold that a trier of fact may determine the extent of vision loss as total when sight is so destroyed that there remains no useful vision.

JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION; COSTS TO BE PAID BY APPELLEE.