Carolyn JONES, Petitioner,

v.

DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES, Respondent.

No. 10–AA–628.

District of Columbia Court of Appeals.

Submitted March 9, 2011.

Decided April 26, 2012.

Kirk D. Williams for petitioner.

David A. Hyden, Assistant Attorney General, with whom Peter J. Nickles, Attorney General for the District of Columbia at the time the brief was filed, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for respondent.

Before GLICKMAN and THOMPSON, Associate Judges, and RUIZ, Associate Judge, Retired.*

RUIZ, Associate Judge, Retired:

Carolyn Jones, petitioner, asks this court to review the determination of the Department of Employment Services ("DOES") that she is entitled to a 7% permanent partial disability award for an injury to her left leg. She argues that (i) the factual record does not rationally support the hearing examiner's conclusions of law; (ii) the hearing examiner erroneously credited the opinion of an independent physician over petitioner's treating physician; and (iii) the hearing examiner failed to apply the law to the record as a whole. We are unable to review the agency's order on the record presented, and remand for further proceedings consistent with this opinion.

## I.

■■■ We note at the outset that it is the decision of the DOES Compensation Review Board (CRB) to affirm the hearing examiner's decision—and not the decision of the administrative law judge—that is under review. *See St. Clair v. District of Columbia Dep't of Emp't Servs.*, 658 A.2d 1040, 1044 (D.C.1995). Therefore, our review is very limited. We will affirm the CRB's decision unless it was "[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." D.C.Code § 2–510(a)(3)(A) (2001); *Washington Metro Area Trans. Auth. v. Dis-*

*trict of Columbia Dep't of Emp't Servs.*, 683 A.2d 470, 472 (D.C.1996) ("We will not disturb the agency's decision if it flows rationally from the facts which are supported by substantial evidence in the record."). Moreover, "[w]here there is substantial evidence to support the Director's findings ... then the mere existence of substantial evidence contrary to that finding does not allow this court to substitute its judgment for that of the [CRB]." *Gary v. District of Columbia Dep't of Emp't Servs.*, 723 A.2d 1205, 1209 (D.C.1998) (quoting *McEvily v. District of Columbia Dep't of Emp't Servs.*, 500 A.2d 1022, 1024 n. 3 (D.C.1985)).

## II.

Petitioner was a part-time usher for the D.C. Department of Sports and Entertainment, showing patrons to their seats at the D.C. Armory and RFK Stadium. While working in that capacity, she fell down a flight of stairs at the D.C. Armory and injured her left knee. She subsequently filed for partial disability benefits with the Office of Risk Management Disability Compensation Program ("DCP"). Petitioner's treating physician was of the opinion that petitioner had suffered a 20% impairment to her left knee. An independent physician, who examined petitioner at the request of DCP, thought that she had suffered a 6% impairment. On November 12, 2008, DCP determined that petitioner had sustained a 13% permanent partial impairment, essentially splitting the difference between the opinions of the two physicians. Petitioner subsequently requested an administrative review of her award.

An evidentiary hearing was held before an Administrative Law Judge ("ALJ") on August 18, 2009. The record remained open for further submissions until Septem-

---

* Judge Ruiz was an Associate Judge of the court at the time of submission. Her status changed to Associate Judge, Retired on September 1, 2011.

ber 14, 2009, and the ALJ issued a written Compensation Order on October 6, 2009. In the order, the ALJ found that petitioner "ha[d] reached maximum medical improvement and ha[d] sustained permanent impairment as a result of her work-related injury." As a result of her injuries, the petitioner could "stand and walk but [could] not kneel, climb or squat" and "continue[d] to have difficulty exercising regularly, mowing her lawn, and going up and coming down steps." The injury did not affect petitioner's full-time job at the Federal Bureau of Investigation as an equal employment specialist, a position she had continued to hold since the time of her injury, but it did impede her ability to work part-time, as she had before she fell, as an usher at a sports facility.

■ As for the degree of petitioner's physical impairment, the ALJ noted that petitioner's treating physician had examined her only three times over the course of a year, and that his most recent examination had occurred two months before he submitted his opinion. That opinion had been issued in September 2007, more than a year before the DCP's determination, and was "based upon a records review" rather than upon a recent examination. In addition, the treating physician had not used applicable American Medical Association ("AMA") Guides to Permanent Partial Impairment in making his diagnosis. The independent physician, on the other hand, had "provide[d] a detailed history of [petitioner's] medical treatment, and he thoroughly explain[ed] his assessment of a 6% permanent impairment with references to the AMA's Guides to Permanent Partial Impairment." He had also examined petitioner in May 2008, much more recently than the treating physician. Accordingly, the ALJ credited the opinion of the independent physician over the opinion of the treating physician, and found that petitioner suffered a 6% physical impairment. However, the ALJ also noted that "[t]he

degree of disability in any case cannot be measured by physical condition alone," and determined that petitioner qualified for a 7% partial disability award.

■ The CRB affirmed the ALJ's determination in a written Decision and Order issued on April 28, 2010. With respect to the relative weight of the physicians' opinions, the CRB correctly noted that while "attending physicians are ordinarily preferred as witnesses to those doctors who have been retained to examine the claimant solely for purposes of litigation," *Stewart v. District of Columbia Dep't of Emp't Servs.*, 606 A.2d 1350, 1353 (D.C. 1992), "[w]here conflicting medical testimony exists, ... 'the hearing examiner, as judge of the credibility of witnesses, may reject the testimony of a treating physician and decide to credit the testimony of another physician when there is conflicting evidence.'" *Mexicano v. District of Columbia Dep't of Emp't Servs.*, 806 A.2d 198, 205 (D.C.2002) (quoting *Clark v. District of Columbia Dep't of Emp't Servs.*, 772 A.2d 198, 202 (D.C.2001)). If the hearing examiner decides to reject the testimony of the treating physician, however, she must "set[ ] forth specific and legitimate reasons for doing so." *Id.* (quoting *Olson v. District of Columbia Dep't of Emp't Servs.*, 736 A.2d 1032, 1041 (D.C.1999)).

In her order, the ALJ credited the opinion of the independent physician over the treating physician for several specific reasons: the independent physician had examined petitioner more recently than the treating physician; the independent physician had authored his opinion immediately after examining petitioner, whereas the treating physician made his diagnosis based on a "records review" more than two months after his last examination; the treating physician had examined petitioner only three times over the course of the year prior to rendering his opinion (lessen-

ing the weight his opinion would ordinarily be given as the "treating physician"); and only the independent physician had referred to the applicable AMA guidelines in making his diagnosis. *See* D.C.Code § 32–1508(3)(U–i) (indicating that in determining the degree of permanent partial disability for a scheduled member, "the most recent version edition of the American Medical Association's Guides to the Evaluation of Permanent Impairment may be utilized"); 7 DCMR § 3132.9 (2010) (listing reasons for rejecting a treating physician's opinion, including "[t]he fact that the opinion(s) of the treating physician is not supported by medically acceptable clinical and laboratory diagnostic techniques" and "[t]he fact that the opinion(s) of the treating physician is inconsistent with the other substantial evidence of record").[1] We conclude that the ALJ gave sufficient, specific reasons for rejecting the testimony of the treating physician.[2]

As for the petitioner's claims that the ALJ failed to adequately apply the law to the entirety of the record and that the ALJ's findings do not flow rationally from the record, the CRB observed that, in arriving at a 7% disability determination, the ALJ recognized that the award of disability benefits was ultimately a legal, and not a medical, determination, and "applied the facts to the law and concluded [what] she thought best would compensate the claimant," after taking into account the relevant facts, including the petitioner's complaints of immobility and difficulty using her left leg for ordinary activities, as well as the probable effect of the petitioner's injury on her future wage-earning potential. *See Negussie v. District of Columbia Dep't of Emp't Servs.*, 915 A.2d 391, 398 (D.C.2007) (noting that "disability is an economic concept rather than a medical condition") (quoting *Washington Post v. District of Columbia Dep't of Emp't Servs.*, 675 A.2d 37, 41 (D.C.1996)). In light of evidence substantiating these facts in the record, the CRB upheld the ALJ's determination of a 7% disability award as having been "supported by substantial evidence" and "in accordance with the law."

■ We cannot say that there isn't substantial evidence in the record that could support the ALJ's determination. However, we also cannot say what that evidence is or how the ALJ considered it in coming to a determination that petitioner was entitled to 7% disability compensation. The CRB was of the view, however, that it could not ask for more from the ALJ because of the nature of a disability award:

> Unlike other questions that ALJs are called upon to decide in connection with contested compensation claims, there is no dichotomous answer in schedule award cases where the ALJ must make a choice between compensable or non-compensable, causally related or not causally related, employment relationship or no employment relationship,

---

1. Section 3132 of DCMR Chapter 7 was amended, effective October 4, 2010. *See* 57 D.C.Reg. 9540 (October 8, 2010); 57 D.C.Reg. 12224, 12236 (December 24, 2010). The amended section now provides that a report from an Additional Medical Examination (AME) "shall be conclusive and responsive to the requests from the Program as part of a complete professional evaluation. Prior to any determination of coverage based upon the recommendation(s) of an AME, the injured employee's treating physician shall have thirty (30) days from receipt of a copy of the

AME to submit written comments to the Program regarding the AME finding(s)." 7 DCMR § 3132.3 (2011).

2. The CRB stated that the ALJ "did not prefer the opinion of the IME doctor, Dr. Johnson, to the opinion of [the treating physician] Dr. Magee." To the extent the ALJ "reject[ed]" the IME's opinion, it was in the context of recognizing that it was a "purely medical opinion," not one directed to economic disability.

timely notice or untimely notice, etc. Those questions present scenarios in which there is presumably a right answer and a wrong answer. However, schedule loss cases present the problem of prediction: the goal is to make the best approximation of the effect of a schedule injury on future wage loss, and then to express that approximation in percentage terms of the member in question based upon "arbitrary" number of weeks of benefits (Citation omitted). Only time will determine whether, in any given case, the approximation arrive[d] at through the hearing process is close to the "right answer," or is wildly under reality, or wildly over it. That may be unfortunate, for either the employer or the worker, but as the Court of Appeals has recognized, that is the nature of the system. *Majano v. Linens of the Week,* CRB No. 07–066 AHD No. 06–285 (April 4, 2007).[3]

We can agree with the basic premise expressed by the CRB that the determination of disability is not an exact science, and that it necessarily involves a certain amount of "prediction," in making a scheduled award for partial loss (or loss of use) of a member. But whether or not the measure for such a disability award, expressed by the statute in terms of weeks of pay, *see* D.C.Code § 32–1508(3), may be described as "arbitrary," it cannot be countenanced that the ALJ's decision-making itself can be arbitrary.[4] There is a qualitative difference between recognizing that in making a legal determination of disability, the ALJ comes to a conclusion based on a complex of factors, taking into account physical impairment and potential for wage loss, and the application of judgment based on logic, experience and even "prediction," and considering that any disability determination by the ALJ, once made, is impermeable to review. We cannot accept "the predictive nature of the judgment 'as though it were a talisman under which any agency decision is by definition unimpeachable.'" *Int'l Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795, 821 (D.C.Cir.1983) (quoting *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

Judicial deference to an agency's determination is based on recognition that the agency has expertise and that authority to make a discretionary judgment has been allocated to another decision maker by the legislature. *See District of Columbia Office of Human Rights v. District of Columbia Dep't of Corrs.,* 40 A.3d 917 (D.C.2012). But a reviewing court still has a role to play, and if it is to be able to do so, it must know the reasons that underlie the decision made by the agency. As the District of Columbia Circuit has observed,

**3.** We note that *Majano* is not an opinion of this court, but of the CRB.

**4.** *See Smith v. District of Columbia Dep't of Emp't Servs.,* 548 A.2d 95, 101 (D.C.1988) (describing as "arbitrary" the worker compensation statute's "exact numbers of weeks assigned to losses of particular members" and noting that its origins "are lost in mists of early compensation history") (quoting 2 LARSON, WORKMEN'S COMPENSATION LAW, § 58.11, at 10–324 (1987)). *Smith's* use of the word "arbitrary" cannot be taken out of context. Here, for example, the ALJ's Compensation Order stated that "the Court of Appeals has held that the arbitrary level of compensation of a schedule award represents a legislative determination which balances the physical effects of an injury against its effects on a claimant's future wage earning prospects." The Order cites *Upchurch v. District of Columbia Dep't of Emp't Servs.,* 783 A.2d 623, 627 (D.C.2001), and *Negussie,* 915 A.2d at 392. In neither case, however, has this court referred to the ALJ's determination of disability as "arbitrary"; to the contrary, the court has said that it requires the exercise of "discretion." *Negussie,* 915 A.2d at 392.

Expert discretion is secured, not crippled, by the requirements for substantial evidence, findings and reasoned analysis. Expertise is strengthened in its proper role as the servant of government when it is denied the opportunity to "become a monster which rules with no practical limits on its discretion." *Burlington Truck Lines v. United States*, 371 U.S. 156, 167, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).... "The deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia." *Volkswagenwerk Aktiengesellschaft v. F.M.C.*, 390 U.S. 261, 272, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968).

*Greater Bos. Tel. Corp. v. F.C.C.*, 444 F.2d 841, 850–52 (D.C.Cir.1971). "Although a court is not to substitute its judgment for that of an agency, '[n]evertheless, the agency must examine the relevant data and articulate a satisfactory explanation.'" *Borough of Columbia v. Surface Transp. Bd.*, 342 F.3d 222, 241 (3d Cir.2003) (quoting *Motor Vehicle Mfrs. Ass'n, Inc.*, 463 U.S. at 43, 103 S.Ct. 2856).

The court is charged, by statute, "to hold unlawful and set aside" an agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." D.C.Code § 2–510(a)(3)(A). That determination cannot be made unless the court has a basis for evaluating the agency's exercise of discretion, and we require that it be provided, for otherwise, we risk " 'invit[ing] the exercise of [administrative] impressionism. Discretion there may be, but 'methodized by analogy, disciplined by system.' CARDOZO, THE NATURE OF THE JUDICIAL PROCESS, 139, 141 (1921). Discretion without a criteria for its exercise is authorization of arbitrariness.' " (*James*) *Johnson v. United States*, 398 A.2d 354, 366 (D.C.1979) (quoting *Brown v. Allen*, 344 U.S. 443, 496, 73 S.Ct. 397, 97 L.Ed. 469 (1953)).[5]

Here, because the ALJ did not explain her reasoning in arriving at a disability award of 7%, we are unable to meaningfully review the decision to determine whether it is based on substantial evidence, applying proper legal principles. *See Spikner v. City & County of Denver*, 513 P.2d 734 (Colo.Ct.App.1973) (holding the Industrial Commission and referee failed to make findings of fact in determining the claimant was entitled to 7½% permanent partial disability benefits in worker's compensation). In a similar worker's compensation case, when presented with a dearth of factual findings,

---

**5.** We have compared judicial review of discretionary judgments by administrative agencies and lower courts. *See* (*James*) *Johnson*, 398 A.2d at 366 ("Determinations committed to the trial court's discretion do not submit themselves to a highly structured review for abuse of discretion as easily as do most administrative determinations. Administrative decisions typically are produced with such formality that the language of the decision provides a mechanism for evaluating it.").

In reviewing lower court decisions for abuse of discretion, we have held:

First, we ask whether the decision at issue was committed to the trial court's discretion. Second, we look to see whether the trial court recognized that it had discretion and whether it purported to exercise it.

Third, we examine the record to see whether it "reveal[s] sufficient facts upon which the trial court's determination was based." For this factor, we have noted that "[a]n informed choice among the alternatives requires that the trial court's determination be based upon and drawn from a firm factual foundation." Fourth, we must determine whether the trial court exercised discretion erroneously. To do so, we must determine "whether the decision maker failed to consider a relevant factor, whether he relied upon an improper factor, and whether the reasons given reasonably support the conclusion."

(*Markus*) *Johnson v. United States*, 960 A.2d 281, 295 (D.C.2008) (quoting (*James*) *Johnson*, 398 A.2d at 363–66).

the Indiana Court of Appeals explained what is required:

> [A] simple straight-forward statement of what happened. A statement of what the Board finds has happened; not a statement that a witness, or witnesses, testified thus and so. It is statement in sufficient *relevant* detail to make it mentally graphic, i.e., it enables the reader to picture in his mind's eye what happens. And when the reader is a reviewing court[,] the statement must contain all the specific facts relevant to the contested issue or issues so that the court may determine whether the Board has resolved those issues in conformity with the law.

*Whispering Pines Home for Senior Citizens v. Nicalek,* 333 N.E.2d 324, 326 (Ind. Ct.App.1975).[6] In this case, we know that the ALJ resolved the conflict between the two doctors and found that petitioner had suffered a physical impairment to her left leg of 6%. We also know that the ALJ was properly aware that the disability determination was not the same as physical impairment, and required a determination of economic wage loss. *Washington Post,* 675 A.2d at 40 (quoting *American Mut. Ins. Co. v. Jones,* 426 F.2d 1263, 1265 (D.C.Cir.1970)). There is evidence in the record that petitioner established such a loss because she could not perform her part-time work.[7] Petitioner claims that her impairment has restricted her to sedentary work, resulting in economic disability in excess of 20%.[8] The ALJ stated in conclusory terms, with apparent contradiction, that, "In consideration of the evidence in the record as detailed above, and *setting aside any consideration of wage loss but presuming an effect on [c]laimant's earning capacity,* [c]laimant qualifies for a 7% permanent partial disability award for her left leg disability." (emphasis added). How the ALJ determined that the disability award should be 7%—and not, for example, 1%, 10% or 30%—is a complete mystery, however.

On this record, therefore, we are unable to affirm the CRB's conclusions that the ALJ's determination flowed rationally from the factual findings, and that the ALJ in fact applied the law taking into account the entirety of the record. We remand the case so that the agency can, in further proceedings, make such additional findings of fact and reasoned conclusions of law, as will support the determination of the disability award.

*So ordered.*

---

6. The Indiana Worker's Compensation Act does not require "specific" findings of facts, but only that the "full board" give an explanation "sufficient to present both the sufficiency of the facts found to sustain the award and the sufficiency of the evidence to sustain the findings of fact." Ind.Code § 22–3–4–5 (2011).

7. Although neither the ALJ nor the parties have referred to the relative amounts petitioner received from her full-time and part-time employment, we note that there are documents in the record (one from employer's counsel) that petitioner's wages from her part-time work comprised approximately 20% of her overall earnings.

8. According to petitioner's brief, the ALJ did not take into account petitioner's "uncontested and credible testimony that the pain in her knee presented her from climbing stairs, kneeling, carrying, squatting, lifting and overall ambulating ... that she requires a cane and has objective evidence of both nerve entrapment and wasting or atrophy of the left thigh ... [resulting in] the loss of industrial use of her left lower extremity."