# District of Columbia
# Court of Appeals

No. 14-AA-1141

M.C. DEAN, INC., *et al.*,

Petitioners,



FILED

JUL -7 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

v.

DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES,

Respondent,

    &amp;                                  **CRB-056-14**

ANTHONY LAWSON,

Intervenor.

On Petition for Review of an Order
of the District of Columbia Compensation Review Board

BEFORE: GLICKMAN, BLACKBURNE-Rigsby and MCLEESE, *Associate Judges*.

## J U D G M E N T

This case came to be heard on the administrative record, a certified copy of the agency hearing transcript and the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the petition for review is granted, and the case is remanded to the Compensation Review Board ("CRB") for resolution of that legal question. Additionally, the case is remanded for clarification of the disability analysis.

For the Court:

*Julio A. Castillo*

JULIO A. CASTILLO
Clerk of the Court

Dated: July 7, 2016.

Opinion by Associate Judge Anna Blackburne-Rigsby.

Concurring opinion by Associate Judge Roy W. McLeese.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-AA-1141

M.C. DEAN, INC., *ET AL.*, PETITIONERS,

FILED 7/7/16
District of Columbia
Court of Appeals

*Julio Castillo*
Julio Castillo
Clerk of Court

v.

DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES, RESPONDENT,

and

ANTHONY LAWSON, INTERVENOR.

Petition for Review of a Decision of the Compensation Review Board of the District of Columbia Department of Employment Services
(CRB-056-14)

(Argued September 16, 2015                    Decided July 7, 2016)

*D. Stephenson Schwinn*, with whom *Raphael J. Cohen* was on the brief, for petitioners.

*Karl A. Racine*, Attorney General, *Todd S. Kim*, Solicitor General, and *Loren L. AliKhan*, Deputy Solicitor General, on the statement in lieu of brief for respondent.

*Eric M. May* for intervenor.

Before GLICKMAN, BLACKBURNE-RIGSBY, and MCLEESE, *Associate Judges*.

Opinion for the court by *Associate Judge* BLACKBURNE-RIGSBY.

Concurring opinion by *Associate Judge* MCLEESE at page 26.

BLACKBURNE-RIGSBY, *Associate Judge*:   Intervenor Anthony Lawson, a street light technician, filed for permanent partial disability benefits for impairment of both of his arms resulting from a neck and shoulder injury he sustained during the course of his employment with petitioner M.C. Dean, Inc.  The Administrative Law Judge ("ALJ") awarded Mr. Lawson "schedule" benefits based on a forty-five-percent (45%) permanent partial disability rating for Mr. Lawson's "right upper extremity" and a thirty-percent (30%) permanent partial disability rating for his "left upper extremity."[1]  M.C. Dean and its co-petitioner, insurer Zurich North America, appealed to the Compensation Review Board ("CRB"), which affirmed the ALJ's order.

On petition for review to this court, petitioners argue that the CRB erred by affirming the ALJ's compensation order that improperly (1) combined non-schedule impairments of the neck and shoulders and schedule impairments of the arms into assessments of the "upper extremities" when awarding schedule disability benefits for the "arms," and (2) considered the impact of the impairments

---

[1]  "Schedule" benefits automatically compensate for economic disability of particular parts of the body with a conclusively-presumed amount.  "Non-schedule" benefits are based on the actual wage loss that results from an economic disability.  Here, Mr. Lawson sought only a schedule award for disabilities of both arms, while neck and shoulder disabilities give rise to non-schedule awards.  The ALJ and CRB used the term "upper extremity" throughout this case to support a schedule disability award for the "arm."

on Mr. Lawson's personal, social, and occupational activities in addition to the statutory factors to increase the schedule disability award. We grant the petition for review, reverse the disability award, and remand for legal clarification by the CRB of the injuries attributable to the "arm," versus the upper extremity, pursuant to a schedule award and for new disability analysis by the ALJ consistent with D.C. Code § 32-1508 (3)(U-i) (2012 Repl.).

## I. Background

### *Injury and Treatment*

On April 1, 2006, Mr. Lawson sustained an injury to his neck and shoulders while lifting a 200-pound transformer base during the course of his employment as a streetlight technician with M.C. Dean.[2] Mr. Lawson first sought treatment less than two weeks after the injury. When the injury failed to heal, he began physical therapy in August 2007. Even after ongoing physical therapy and left rotator cuff surgery in February 2008, Mr. Lawson continued to experience discomfort in his

---

[2] With the exception of temporary disability benefits collected during recuperation from the surgeries discussed herein, Mr. Lawson never stopped work or lost any wages, and M.C. Dean did not make any voluntary payments for permanent disability.

neck and both shoulders, which by October 2008 was radiating down his arms, producing numbness in both hands, and causing swelling in his right arm and hand. He was then referred to Dr. Moskovitz, an orthopedic surgeon who supervised Mr. Lawson's treatment through the administrative hearing in 2013. Mr. Lawson had spinal fusion surgery in October 2009, but he experienced only minor improvement and continued his physical therapy and consultation with Dr. Moskovitz. By February 2011, Mr. Lawson's "major complaints" involved his arms rather than his neck and shoulders, including intermittent numbness and tingling when he turned his head or bent his elbows and pain in his wrists and triceps. Mr. Lawson's last treatment prior to the administrative hearing was carpal tunnel surgery on his right hand in December 2012.

### *Administrative Proceedings and the ALJ's Compensation Order*

Mr. Lawson filed his compensation claim in January 2012. Both parties obtained permanent partial impairment diagnoses for purposes of the litigation. Mr. Lawson's expert was treating physician Dr. Moskovitz, who was qualified as an expert in orthopedic surgery without objection. Dr. Moskovitz determined that Mr. Lawson had a twenty-seven percent (27%) impairment of the entire body on March 15, 2012, based on "class III cervical spine impairment that is permanent

with modifiers for rotator cuff disease, AC [acromioclavicular] arthritis and persisting neuritis/CTS [carpal tunnel syndrome]." Because the District of Columbia Workers' Compensation Act ("the Act")[3] recognizes separate schedule and non-schedule disabilities rather than compensating the percentage of full-body impairment, Mr. Lawson's counsel requested an adjusted calculation of the impairment specifically for the "upper extremity (ies)." In his response dated May 31, 2012, Dr. Moskovitz provided a new assessment of Mr. Lawson's condition based on the current edition of the American Medical Association *Guides to the Evaluation of Permanent Impairment* ("AMA *Guides*"): permanent physical impairment of the right upper extremity equal to nineteen percent (19%) of the whole person or thirty-one percent (31%) of the right upper extremity itself, and permanent physical impairment of the left upper extremity equal to nine percent (9%) of the whole person or sixteen percent (16%) of the left upper extremity itself. In his deposition, Dr. Moskovitz indicated that carpal tunnel surgery could improve the impairment assessments of each upper extremity by just one percent.

The specifics of Dr. Moskovitz's methodology are important. In both his written assessments and his deposition, Dr. Moskovitz discussed the impairments of Mr. Lawson's neck, shoulders, arms, and hands together. He explained that the

---

[3] D.C. Code §§ 32-1501 to -1545 (2012 Repl.).

current edition of the AMA *Guides* makes separation of specific impairments more difficult, which prompted him to initially evaluate impairment of the whole person. When separately assessing impairments of the left and right upper extremities, he did so with the understanding that "[t]he upper extremity begins at the base of the skull." Dr. Moskowitz found a causal link between the impairments and the April 2006 injury with reasonable certainty.

Petitioners paid for an independent expert evaluation of Mr. Lawson's injuries by Dr. Scheer, also an orthopedic surgeon. Applying the AMA *Guides*, he concluded in his final assessment completed July 2, 2012, that Mr. Lawson suffered only a ten percent (10%) impairment of the left upper extremity causally related to the April 2006 injury with no causally related impairment of the right upper extremity. Dr. Scheer identified a further two percent (2%) impairment of each upper extremity from ulnar neuropathy unrelated to the April 2006 injury.

Mr. Lawson testified at the administrative hearing on February 14, 2013. He described his injury and the long series of treatments. Because the hearing was held just two months after his right hand carpal tunnel surgery, he could not yet determine whether the operation had improved his condition. He did not show any wage loss, but he indicated that he was assigned fewer job duties, was a less

efficient worker, and could no longer supplement his income with contract work. The record does not indicate how much income Mr. Lawson previously received from the supplemental contract work, and the parties had stipulated his weekly wages at $1120, which produces a statutory compensation rate of $745.[4] He also described the impact of his injury on activities outside work, such as an inability to carry grocery bags and to play recreational sports.

Mr. Lawson sought schedule benefits for a fifty-percent (50%) permanent partial disability of his right upper extremity and a thirty-percent (30%) permanent partial disability of his left upper extremity. In his post-hearing brief, Mr. Lawson explained that he sought "a much higher disability rating than the [impairment] ratings" assigned by Dr. Moskovitz due to his "limited opportunities for advancement based on his skills, work history, and the restrictions imposed by his disability." In the compensation order, the ALJ credited Dr. Moskovitz, the treating physician, over Dr. Scheer, hired by the employer for purposes of litigation. The ALJ found Dr. Moskovitz's medical opinion to be more persuasive

---

[4] $745 reflects the statutory amount of 66 ⅔% of Mr. Lawson's average weekly wage. *See* D.C. Code § 32-1508 (3). For complete loss of arm function, an employee receives 312 weeks' compensation. § 32-1508 (3)(A). Although the actual monetary award was not specified, it appears that Mr. Lawson would receive seventy-five percent (75%) of the value of an arm lost, producing a compensation amount of $174,330 (0.75 **x** $745/week **x** 312 weeks).

and consistent with the record, and the ALJ accepted his conclusions that Mr. Lawson's impairments resulted from the April 2006 work injury and that Mr. Lawson had reached maximum medical improvement. The ALJ therefore found that Mr. Lawson had a thirty-one percent (31%) impairment of the right upper extremity and a sixteen percent (16%) impairment of the left upper extremity based on Dr. Moskovitz's medical assessment.

The ALJ then proceeded from the medical impairment analysis to the non-medical disability analysis to determine the extent of Mr. Lawson's permanent partial disability. Starting with the right upper extremity, the ALJ considered the five factors from D.C. Code § 32-1508 (3)(U-i): pain, atrophy, weakness, loss of endurance, and loss of function. Based on Mr. Lawson's testimony and the medical evidence, the ALJ assigned ten percent permanent partial disability for pain, ten percent for weakness, and ten percent for loss of endurance. The ALJ then increased the disability finding by five percent for each of three other unidentified factors (referred to only as "these finding" [sic] and "these factors" in the compensation order) for "a total 45 per cent disability of the right upper extremity."

Turning to the left upper extremity, the ALJ found "the same symptoms affecting that body part as he does on the right side, although perhaps not as extreme." The ALJ assigned five percent permanent partial disability for pain, five percent for weakness, and five percent for loss of endurance. The ALJ then considered the impact of the injury on Mr. Lawson's personal life, specifically on "personal activities" such as sleeping and shopping, "social activities" such as recreation, and "occupational activities" such as independent contract work. The ALJ assigned an additional five percent disability for each of those activities, producing "a total 30 per cent permanent partial disability of the left upper extremity." The ALJ never considered whether the "upper extremities" as defined by Dr. Moskowitz differed from the "arms" as stated in the Act's schedule. Petitioners appealed to the CRB.

### *The CRB's Decision and Order*

Petitioners appealed the ALJ's compensation order to the CRB, arguing that the ALJ erred by (1) awarding schedule benefits for impairment of the arms based on non-schedule injury to the neck and shoulders and (2) considering personal, social, and occupational impacts beyond the scope of the economic disability

inquiry under D.C. Code § 32-1508 (3)(U-i).[5]  In its decision, the CRB noted that, "It is axiomatic that disability experienced in a schedule member may be compensable even if the anatomical situs of this injury is a non-schedule body part," citing *WMATA v. District of Columbia Dep't of Emp't Servs. (Chang)*, 683 A.2d 470 (D.C. 1996).  The CRB determined that the ALJ's disability findings for Mr. Lawson's arms were supported by substantial evidence, regardless of other treatment or disability to the neck and shoulders.  The CRB did not address petitioners' argument that Dr. Moskowitz included the neck and shoulders, not just the arms, in the "upper extremity" impairments that the ALJ fully credited and relied upon in determining the schedule disability awards.

The CRB also held that the ALJ properly considered personal and social activities in his disability determination.  It reasoned that "[a] claimant's inability to perform personal or social activities can demonstrate an effect on the ability to perform job duties."  The CRB noted that an inability to carry groceries or play sports "demonstrate[s] an inability to perform functions similar to those required by [Mr. Lawson's] job" that involves heavy lifting.  It also found that an additional disability award for occupational activities was proper because "consideration of a

---

[5]  Petitioners also challenged the ALJ's failure to credit them for the amount of temporary benefits paid after Mr. Lawson's various surgeries, but the CRB declined to address the issue because petitioners did not raise it before the ALJ.

disability's effect on occupational capacity is precisely what an ALJ is tasked to do when assessing schedule member permanent partial disability." The CRB therefore affirmed the compensation order, and M.C. Dean and Zurich North America filed a petition for review with this court.

## II. Analysis

### A. *Standard of Review*

"Our review of a final order of the CRB is limited to determining whether the decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Reyes v. District of Columbia Dep't of Emp't Servs.*, 48 A.3d 159, 164 (D.C. 2012) (internal quotation omitted). We will affirm if "(1) the agency made findings of fact on each contested material factual issue, (2) substantial evidence supports each finding, and (3) the agency's conclusions of law flow rationally from its findings of fact." *Id.* Although we review the decision of the CRB, we cannot ignore the ALJ's compensation order which is the subject of the CRB's review, and we will remand if the ALJ's factual findings are not supported by substantial evidence. *Id.* Finally, when a petitioner challenges the CRB's interpretation of the Act, we defer to the agency's interpretation unless it is

"unreasonable or in contravention of the language or legislative history of the statute." *Howard Univ. Hosp. v. District of Columbia Dep't of Emp't Servs.* (*Petway*), 994 A.2d 375, 377 (D.C. 2010) (quotation omitted).

## B. Whether the Schedule Award for the "Upper Extremity" Was Appropriate

The term "upper extremity" used by Dr. Moskovitz in his assessment is not specifically defined in the Act or related regulations. Petitioners challenge whether the "upper extremity" is synonymous with the term "arm" used, but not specifically defined in, the Act for purposes of a schedule award. *See* D.C. Code § 32-1508 (3)(A). *See generally Continental Ins. Cos. v. Pruitt*, 541 S.W.2d 594, 595 (Tenn. 1976) (rejecting argument that "upper left extremity" was equivalent to the left "arm" for purposes of statutory workers' compensation schedule). Petitioners attack the methodology behind Dr. Moskovitz's upper extremity assessments because he began at the base of the skull and included impairments to the neck and shoulders. They contend that the mingling of the schedule (arm) and non-schedule (neck and shoulder) impairments required the ALJ to separate out the economic disability attributable to just the arms before making an award. Mr. Lawson counters that Dr. Moskovitz limited his assessment to arm impairments and the ALJ properly credited Dr. Moskovitz's diagnoses.

Our review of Dr. Moskovitz's deposition testimony in the record indicates that he included more than Mr. Lawson's arms in his assessment of the upper extremity impairments. Specifically, in his initial assessment, Dr. Moskovitz explained that he "combined everything related to cervical spine and shoulders as a whole person rating, and [he] understood later that the statutory requirements or regulatory requirements, whatever they are in the District of Columbia, require a different classification . . . ." Having included "everything" in his whole person rating, Dr. Moskovitz did not exclude neck and shoulder impairments from his new calculations for the upper extremities because, in his view, "[t]he upper extremity begins at the base of the skull." The inclusion of everything beginning at the base of the skull — neck, shoulder, and arm impairments together — in both the "whole person" and "upper extremity" assessments is further reflected by Dr. Moskovitz's statements that the upper extremity impairments, if translated into a whole person impairment number, would be "pretty consistent," if not "exactly the same figure," presumably because he was simply subdividing the exact same impairments into right and left sides. Finally, when asked for his "opinion within a reason[able] degree of medical certainty as to the impairments of [Mr. Lawson's] upper extremities as a result of the April 1st, 2006 injury," Dr. Moskovitz responded that "the physical impairment of [Mr. Lawson's] right upper extremity is 31 percent based on residual neurological impairment, rotator cuff impairment and that his

physical impairment of the left upper extremity is 16 percent based on his cervical spine impairment and rotator cuff/arthritis treated surgically in the past."[6] The references to impairments of the rotator cuff and cervical spine further reflect that Dr. Moskovitz adhered to his definition of "upper extremity" and included impairments of the neck and shoulders up to "the base of the skull."

The terms "arm" and "upper extremity" are often used interchangeably for purposes of schedule awards. *See, e.g.*, *Negussie v. District of Columbia Dep't of Emp't Servs.*, 915 A.2d 391, 393–95 (D.C. 2007) (claimant sought "a schedule award of 28% for permanent partial disability to the left arm" but the ALJ awarded "six percent (6%) permanent partial disability for loss of industrial use of the left upper extremity"). Yet Dr. Moskovitz's definition ("upper extremity begins at the base of the skull") reflects a potential distinction in the terms. *See* 7 Larson, *Workers' Compensation Law* § 87.02, at 87-3 & n.4.1 (2015) (noting that physicians may be more comfortable discussing the upper and lower extremities than simply the arm and the leg). Without a clear determination from the CRB as to where the arm begins for purposes of a schedule award, a particular doctor's or

---

[6] Petitioners also attack another aspect of Dr. Moskovitz's methodology, asserting he never determined anything except a whole-body impairment rating including all of Mr. Lawson's injuries. We need not resolve this issue because we have no reason to suppose that it will arise on remand.

ALJ's understanding of the terms "arm" and "upper extremity" may result in the inconsistent determination of schedule awards or, as petitioners contend here, in the arbitrary expansion or reduction of a schedule "arm" award in a particular case.

The fact that Mr. Lawson's injury was limited to the neck and shoulders does not prevent independent impairments of the arms because "it is not the situs of the injury which determines whether a schedule award is payable; it is the situs of the disability resulting from the injury which is controlling." *Petway, supra*, 994 A.2d at 376–77 (quoting *Kovac v. Avis Leasing Corp.,* H & AS No. 84-177, OWC No. 000792, at 6 (Director's Decision July 17, 1986)). However, the Department of Employment Services has previously interpreted the Act to exclude the neck and shoulder from schedule arm awards. *See Morrison v. District of Columbia Dept. of Emp't Servs.*, 736 A.2d 223, 225–26 & n.1 (D.C. 1999) (collecting D.C. administrative cases distinguishing the arm from the shoulder for purposes of schedule awards). *Morrison* presented the inverse of this case: the claimant had suffered one injury that affected both his arm and his shoulder, but he was awarded only schedule benefits for the "right upper extremity" despite also seeking non-schedule benefits based on evidence of his shoulder disability. *Id*. at 226–27. We determined that "right upper extremity" must have meant the arm without the shoulder because it produced a schedule award. *Id*. at 226 n.4. We

therefore remanded because a separate and distinguishable shoulder disability would be separately compensable as a non-schedule disability, subject to a showing of wage loss. *Id.* at 228. Analogously, in *Petway*, we considered a claimant's eligibility for concurrent schedule and non-schedule awards based on impairment of the lower back and legs. 994 A.2d at 376. We used the agency's terminology and affirmed the "finding that the injuries to Ms. Petway's low[er] back and to her lower extremities were 'separate and distinct disabilities' as described in *Morrison . . . .*" *Id.* at 378–79.

Although prior administrative decisions held that actual neck and shoulder impairments can only contribute to non-schedule disability awards, *see Morrison, supra*, 736 A.2d at 225 n.1, the CRB affirmed the compensation order in this case in which the ALJ fully credited Dr. Moskovitz's upper extremity impairment assessment without grappling with the inclusion of neck and shoulder impairments in that assessment. The CRB is entitled to deference in its interpretation of the Act which does not explicitly define either the "arm" or the "upper extremity." The CRB has expertise in the area of workers' compensation and could potentially conclude — though we take no position — that sound policy and legislative intent support a change in the scope of arm awards since *Morrison* was decided in 1999. *Compare Dye v. Indus. Comm'n of Ariz.*, 736 P.2d 376, 378 (Ariz. 1987) (en banc)

(holding shoulder, though part of the "left upper extremity," is not included in a schedule award for the arm), *and Safeway Stores, Inc. v. Indus. Comm'n of Ariz.* (*Peterson*), 558 P.2d 971, 974 (Ariz. Ct. App. 1976) (collecting cases from several jurisdictions distinguishing the arm from the shoulders for workers' compensation awards), *with Strauch v. PSL Swedish Healthcare Sys.*, 917 P.2d 366, 368–69 (Colo. Ct. App. 1996) (stating that the court was "not persuaded . . . as a matter of law that the shoulder is not part of the arm"). Because the extent of the "arm" differentiates schedule awards and non-schedule awards, a definition of that boundary is essential. Looking at this case, while the rotator cuff may lie in a gray area on the border of the shoulder and arm (an important question that the CRB may need to resolve), cervical spine impairments plainly fall within the neck rather than the arm as previously understood. If the CRB has changed the scope of schedule awards for the "arm" since *Morrison* was decided, it must state the change explicitly so that the Act may be uniformly applied.[7]

---

[7] Petitioners also argue that the pain radiating from Mr. Lawson's neck-and-shoulder injury into his arms cannot serve as the basis for a schedule disability award for the arms because radiating pain alone does not constitute a separate and distinct disability. Mr. Lawson counters that the compensation order reflects the independent physical impairments of his arms. Location is significant only to the extent that the CRB determines that the "arm" is not coextensive with the "upper extremity" as assessed by Dr. Moskovitz.

Because the situs of the disability controls rather than the situs of the injury, we have held that "when a petitioner suffers multiple disabilities from a single

(continued . . .)

We therefore remand for the CRB to clarify the definitions of "arm" and "upper extremity" so that the legal scope of schedule awards does not vary from case to case.

---

(. . . continued)

injury, that petitioner is entitled to both schedule and non-schedule benefits, subject to proof that the non-schedule disability led to wage loss." *Morrison, supra*, 736 A.2d at 226. The fact that Mr. Lawson's injury occurred to the neck and shoulders, even if eligible only for non-schedule benefits, does not preclude a schedule award for resulting impairment of the arms. *See id*. at 227–28. It may, however, require separation of the impairments.

Petitioners argue more narrowly that radiating pain alone is non-compensable beyond the impairment from which it radiates. *See Johnson v. District of Columbia Water & Sewer Auth.*, CRB No. 11-013, OWC No. 583201, 2011 DC Wrk. Comp. LEXIS 213 (Apr. 21, 2011). The rule applied in *Johnson* appears to cut against petitioners' bright-line test because the CRB explained that a claimant need only show "distinct, separate, and identifiable functional impact," rather than completely separate diagnoses, to support schedule and non-schedule awards arising from one injury. 2011 DC Wrk. Comp. LEXIS 213, at *9–10 (quoting *Kovac, supra*, H & AS No. 84-177). Their radiating pain argument fails to take into account that the compensation order included substantial impairment findings beyond radiating pain, such as numbness, "a loss of strength in [Mr. Lawson's] upper extremities, and physical limitations regarding overhead work." *See Muhammad v. District of Columbia Dep't of Emp't Servs.*, 774 A.2d 1107, 1113 (D.C. 2001) (remanding a decision denying any disability where the claimant complained of "pain, numbness, reduced coordination, and general dysfunction" in his hand).

### C. *Consideration of Personal, Social, and Occupational Activities*

Petitioners also raise an alternative argument challenging the ALJ's legal analysis. They contend the ALJ erred by first performing the standard five-factor analysis of § 32-1508 (3)(U-i) to arrive at thirty percent (30%) disability for the right upper extremity and fifteen percent (15%) disability for the left upper extremity, then increasing each upper extremity schedule disability award by fifteen percent (15%) based on additional factors not set forth in the statute. For the right upper extremity increase, the compensation order has only one sentence: "Based upon these finding, [sic] I assign 5 per cent disability to each of these factors, for a total 45 per cent disability of the right upper extremity." The other "finding[s]" or "factors" are never identified. For the left arm, the compensation order includes two paragraphs explaining the personal, social, and occupational limitations resulting from the disability before assigning an additional "5 per cent permanent partial disability for the impact the work injury has caused impacting upon [Mr. Lawson's] activities in these areas for a total 30 per cent permanent partial disability of the left upper extremity."

The ALJ's omission of the additional findings regarding the right upper extremity award prevents meaningful review of the decision. "[A] reviewing court

. . . must know the reasons that underlie the decision made by the agency." *Jones v. District of Columbia Dep't of Emp't Servs.*, 41 A.3d 1219, 1224 (D.C. 2012). Petitioners argue that the ALJ relied on the same three factors laid out in the left upper extremity analysis — five percent increases each for personal, social, and occupational activities — when increasing the right upper extremity award. Mr. Lawson counters that the ALJ increased the award by the same three statutory factors used previously — pain, weakness, and loss of endurance — though he cannot explain why the ALJ would reiterate the same factors instead of awarding fifteen percent disability for each factor in the first instance. The debate between counsel at oral argument about the additional factors the ALJ used to determine the disability percentage reflects the lack of clarity in the ALJ's additional award for the right upper extremity. Because the ALJ "fail[ed] to 'explain its reasoning in arriving at a disability award'" for the right upper extremity, "we must remand the case back to the CRB." *Bowles v. District of Columbia Dept. of Emp't Servs.*, 121 A.3d 1264, 1269 (D.C. 2015) (quoting *Jones, supra*, 41 A.3d at 1225).

Turning to the left upper extremity award, petitioners argue that the independent five-percent increases in the disability rating for personal, social, and occupational activities were improper. Mr. Lawson counters that consideration of personal and social activities falls within the ALJ's discretion when assessing the

economic disability resulting from a claimant's impairments. He further argues that consideration of occupational limitations is necessarily within the ALJ's role in determining disability.

The ALJ relied on the general definition of non-medical disability in the AMA *Guides* as authority to award disability benefits for the impact of Mr. Lawson's impairment on his personal and social activities, not just his wage-earning capacity.[8] The CRB noted that "it may appear that considering a

---

[8] When amending the Act, the D.C. Council considered and rejected the direct use of the AMA *Guides* in determining disability. *See* Comm'e Rpt. on Bill 12-192, at 8 (Oct. 29, 1998); *Negussie v. District of Columbia Dep't of Emp't Servs.*, 915 A.2d 391, 397 (D.C. 2007). Recognizing that they are merely *Guides to the Evaluation of Permanent Impairment*, the Council heeded the advice of the AMA that the *Guides* "should not be used to make direct financial awards or direct estimates of disabilities." Rpt. on Bill 12-192, *supra*, at 8. Instead, the Council adopted the five "Maryland factors" as grounds for an ALJ to exercise discretion and find a disability rating that might differ from the impairment rating. Therefore, the statutory reference to the AMA *Guides* reflects the council's judgment that they are a reliable basis for medical opinions about physical impairment, not an intention to allow the American Medical Association to add factors to the District's workers' compensation law. In fact, even when making findings regarding physical impairment, the CRB has held that an ALJ cannot rely upon the AMA *Guides* unless (1) the parties have admitted them into evidence or (2) the ALJ plans to take judicial notice of the *AMA Guides* and gives the parties an opportunity to respond. *See Bowles, supra*, 121 A.3d at 1270.

The ALJ in this case deviated from both principles — it employed the AMA *Guides* in the disability analysis and did so without notice to the parties even though the AMA *Guides* were not admitted into evidence — relying upon the following passage in *Negussie, supra*, 915 A.2d at 397 (quoting *Getson v. WM*

(continued . . .)

disability's impact on personal or social activities should be beyond the scope of compensation offered for work-related injuries," but it affirmed because such a restriction "is shortsighted" since non-work activities could still "demonstrate an effect on the ability to perform job duties." The compensation order did not tie personal and social functions to the multi-factor framework of § 32-1508 (3)(U-i), however, for the ALJ instead provided a five-percent increase for limited "sleep through the night and grocery shopping" (personal) and a five-percent increase for limited "ability to participate in recreational activities" (social) without

---

(. . . continued)
*Bancorp*, 694 A.2d 961, 967–68 (Md. 1997)) (emphasis in original), without regard for context:

> As used in the [AMA] *Guides,* 'impairment' means an alteration of an individual's health status that is *assessed by medical means*, 'disability,' which is *assessed by nonmedical means*, means an alteration of an individual's capacity to meet personal, social, or occupational demands, or to meet statutory or regulatory requirements.

This brief background in the AMA *Guides* was not intended, either by its authors or the D.C. Council, to be a source of legal factors, and it does not change the economic focus of the Act. *See* Comm'e Rpt. on Bill 3-106, at 6 (Jan. 29, 1980) (outlining the "earning capacity" and "whole-man" theories of workers' compensation before selecting the former, with a focus on "replacement of wages lost by disabled worker[s]" and "restoration of earning capacity"). *Negussie* subsequently reiterates the longstanding principle that compensation under the Act is tied to loss of wage-earning capacity, not the existence of a medical injury. *See* 915 A.2d at 397–98; *see also Wheeless v. WMATA*, H & AS No. 89-318, OWC No. 091834, 1998 DC Wrk. Comp. LEXIS 463, at *3 (Apr. 1, 1998) (holding employer did not need to approve claimant's settlement with third-party tortfeasor where "the payments that claimant received in the third party action were for non-economic damages and workers' compensation benefits are for economic loss").

demonstrating a nexus between those limitations and Mr. Lawson's ability to perform job duties.

We conclude that the ALJ erred in failing to demonstrate a nexus between Mr. Lawson's personal and social activities and his wage earning capacity, and therefore the disability award should not have been increased by non-occupational consequences of an injury. A schedule award should not increase based on functional impairment of personal and social activities because those are beyond the economic scope of the Act. [9] While the CRB's observation that personal and social activities may reflect work-related limitations is consistent with our holding, those activities are not independently compensable harms. Contrary to our concurring colleague, we conclude that consideration of personal and social activities is only consistent with the legislative history and structure of the Act if there is a nexus to wage-earning capacity, so a remand on this issue is unnecessary.

---

[9] *Smith v. District of Columbia Dep't of Emp't Servs.*, 548 A.2d 95, 100 (D.C. 1988), explains that "compensation under the Act is predicated upon the loss of wage earning capacity, or economic impairment, and not upon functional disability or physical impairment." *See also Upchurch v. District of Columbia Dep't of Emp't Servs.*, 783 A.2d 623, 627 (D.C. 2001) (stating "[d]isability is an economic and not a medical concept" based on the "loss of wage-earning capacity").

The ALJ also found that Mr. Lawson's arm injuries imposed "physical limitations regarding overhead work" causing an inability to perform some work assignments. These functional limitations both narrowed Mr. Lawson's work assignments and his ability to seek second jobs as an independent contractor. As a result, the ALJ awarded five percent partial disability for occupational limitations. The CRB affirmed, reasoning that "consideration of a disability's effect on occupational capacity is precisely what an ALJ is tasked to do." Petitioners argue that the occupational limitations were *de minimis* and warranted no further award beyond the factor analysis, and Mr. Lawson again relies on *Negussie* and the ALJ's general discretion.

We agree that determining "occupational capacity is precisely what an ALJ is tasked to do," but it is not clear that occupational capacity should be an independent factor evaluated in a vacuum. Limitations of occupational activities are assessed under the statutory structure (with the Maryland factors of pain, weakness, atrophy, loss of endurance, and loss of function), and our recent decisions have emphasized that variance from the physical impairment rating to the economic disability rating should be specifically explained. *See Bowles, supra*, 121 A.3d at 1269–70 (remanding where disability award could not be derived from summation of the possible evidence: "No combination of 7%, 8%, and 5% add[s]

up to just 10%"); *Jones, supra*, 41 A.3d at 1226 (remanding for additional findings where the basis for a 7% disability award "and not, for example, 1%, 10% or 30% — is a complete mystery"). On remand, the CRB should consider whether a compensation order must connect the specific impairments to a factor in the disability analysis instead of compensating occupational capacity in the abstract. If so, the ALJ's findings in this case regarding limited range of motion affecting job duties would still be relevant, and they might support an award increase for "loss of function" under § 32-1508 (3)(U-i)(v).

The ALJ did not clearly explain its award for the right upper extremity. The ALJ also erred by considering personal and social activities as independent factors in the left upper extremity disability analysis without demonstrating an economic nexus to wage-earning capacity. We therefore remand for new disability analysis by the ALJ and clarification of the role of "occupational capacity" in the disability analysis by the CRB.[10]

---

[10] Because we place no independent reliance on the AMA *Guides*, we need not decide Lawson's motion to strike.

### III.   Conclusion

In this case, the ALJ credited an expert whose assessment included all of the claimant's impairments to his neck, shoulder, and arm in the left and right "upper extremity" assessments.  Because the CRB has not clearly determined where the "arm" ends for purposes of a schedule award under D.C. Code § 32-1508 (3)(A), or whether the statutory term "arm" is actually synonymous with the medical term "upper extremity," we grant the petition for review and remand to the CRB for resolution of that legal question.  Additionally, we remand for clarification of the disability analysis.

*So ordered.*

MCLEESE, *Associate Judge*, concurring:  I concur in the judgment, and I join the court's opinion with the exception of n.8 and the full paragraph on p. 23.  In the portions of the opinion that I do not join, the court appears to suggest that an award of permanent disability benefits based on partial impairment of a part of the body specifically listed in D.C. Code § 32-1508 (3) (2015 Supp.) ("scheduled permanent partial disability award") must be tied to "loss of wage-earning capacity."  *Ante* at 22 n.8.  I would not rule so broadly.  As the court explains, *ante* at 21-22, the CRB

did not decide in this case whether non-economic effects of an injury may properly be considered in determining a scheduled permanent partial disability award. Rather, the CRB upheld the ALJ's decision on the ground that the personal and social effects of an injury may be considered to the extent that those effects adversely affect a claimant's ability to perform job duties. *Ante* at 21-22. As the court further explains, however, the ALJ did not limit consideration of personal and social effects to those that adversely affected the claimant's ability to perform job duties. *Ante* at 22-23.

Because we cannot affirm the CRB's basis for upholding the ALJ's decision, we would ordinarily remand for the CRB to consider in the first instance whether non-economic effects may properly be considered in determining a scheduled permanent partial disability award. *See, e.g.*, *Apartment & Office Bldg. Ass'n v. Public Serv. Comm'n*, 129 A.3d 925, 930 (D.C. 2016) ("Generally, an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained. Thus, if a party asks this Court to affirm an agency order based upon a ground that was not considered by the agency, we ordinarily must remand for the agency to consider the new ground in the first instance.") (citations and internal quotation marks omitted). Remand for consideration by the agency in the first instance is not

required, however, if the question at issue could have only one permissible answer. *Id.* ("[R]emand is not required in cases where . . . it is clear what the agency's decision has to be.") (internal quotation marks omitted). I do not view this as such a case.

The applicable statute, D.C. Code § 32-1508, arguably suggests that non-economic effects may properly be taken into account in determining a scheduled permanent partial disability award. Specifically, section 32-1508 (3) provides specific monetary awards for permanent disability involving the complete loss of the use of specified parts of the body. It is well settled that the amount of such awards is not tied to a case-specific showing of economic effect. *See, e.g.*, *DeShazo v. District of Columbia Dep't of Emp't Servs.*, 638 A.2d 1152, 1156 (D.C. 1994) (discussing prior codification of section 32-1508 (3), court explains that benefits are determined "by reference to the type of injury suffered . . . without regard to actual wage loss. . . . The assumption underlying this approach is that, although the claimant may be able to continue working, the impact of the injury causing a permanent partial disability sooner or later will take its toll, and that the scheduled benefit will be an appropriate, if arbitrary, compensation to offset wage losses that eventually can be anticipated.").

When a listed body part is partially impaired rather than completely lost, the award is determined as a proportion of the award for a complete loss. D.C. Code § 32-1508 (3)(S). For purposes of calculating that proportion, the statute authorizes consideration of the American Medical Association's *Guides to the Evaluation of Permanent Impairment*, along with five additional factors: pain, weakness, atrophy, loss of endurance, and loss of function. D.C. Code § 32-1508 (3)(U-i). As we have explained, the AMA *Guides* assess the degree of medical impairment, not necessarily the degree of legal disability. *Negussie v. District of Columbia Dep't of Emp't Servs.*, 915 A.2d 391, 397 (D.C. 2007). The five other statutory factors focus on the physical condition of the body part at issue and are not explicitly tied to a case-specific assessment of the economic effects of an injury.

We have nevertheless held that scheduled permanent partial disability awards are not properly determined based solely on a non-economic medical determination as to the degree of physical impairment. *Negussie*, 915 A.2d at 395-99; *see id.* at 399 ("'[D]isability' is an economic and legal concept which should not be confounded with a medical condition . . . ."); D.C. Code § 32-1501 (8) (2012 Repl.) (defining "disability" as "physical or mental incapacity because of injury which results in the loss of wages"). As far as I am aware,

however, we have not held that scheduled permanent partial disability awards must be tied entirely to a case-specific assessment of actual or predicted "loss of wage-earning capacity." *Ante* at 22 n.8. To the contrary, our decisions arguably leave room for ALJs to base scheduled permanent partial disability awards at least in part on considerations -- such as functional assessments of the degree of impairment -- that are not tied to a case-specific assessment of actual or predicted loss of wage-earning capacity. *See, e.g.*, *Brown v. District of Columbia Dep't of Emp't Servs.*, 83 A.3d 739, 743 n.6 (D.C. 2014) (amount of scheduled permanent partial disability award "varies depending on the particular body part injured and the degree of its impairment, regardless of the actual wage loss the worker sustains as a result of the injury"); *Jones v. District of Columbia Dep't of Emp't Servs.*, 41 A.3d 1219, 1224 (D.C. 2012) (in determining scheduled partial permanent disability awards, ALJs "come[] to a conclusion based on a complex of factors, taking into account physical impairment *and* potential for wage loss") (emphasis added).

In determining the amount of the award in this case, the ALJ gave independent weight to the injury's effects on "personal and social activities." The CRB did not rule in this case as to whether such effects, untied to actual or predicted economic impact, may properly be considered in determining the amount

of a scheduled permanent partial disability award.  I would remand for the CRB to address that issue in the first instance.